**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: ) | |
| ) | |
| HAVENS STEEL COMPANY, ) | Case No. 04-41574 |
| ) | |
| Debtor. ) | |
| ) | |
| HAVENS STEEL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Adversary Proceeding No. 04-4064 |
| ) | |
| COMMERCE BANK, N.A., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

The Debtor, Havens Steel Company, filed the above-captioned adversary proceeding to obtain a declaratory judgment determining the priority of interests in inventory[1] at various locations. Havens named all of the parties claiming an interest in that inventory as defendants. Commerce Bank ("Commerce") claims an interest in all of the inventory pursuant to a security agreement executed by the Debtor in conjunction with a $15 million loan Commerce made to the Debtor. Parsons Odebrecht Joint Venture; The Austin Company/ Cypress Media LLC, d/b/a The Kansas City Star; and Polk County, Iowa (collectively "Purchasers") each claim an interest in the inventory purchased or identified for use on

---

[1] In order to prevent the Debtor's operations from grinding to a halt as a result of Commerce's claim to all of the Debtor's inventory, the Court entered an order on March 25, 2004, requiring the establishment of a segregated account at Commerce Bank into which purchasers of the Debtor's inventory would have to pay (in some cases, a second time) for any inventory used for their respective projects. The money in the segregated account would then represent, in all respects, the legal equivalent of the inventory, and the parties would have the opportunity to litigate the respective priorities in the inventory (now cash) at a later date. This adversary brings that opportunity to fruition.

The March 25 Order was vacated and replaced on April 9, 2004, by an Interim Order which, in turn, was superceded by the Final Order entered on May 10, 2004. The Final Order incorporates all of the terms of the March 25 Order that are pertinent here.

construction projects for which they hired the Debtor to design, fabricate, supply, and erect steel structures. St. Paul claims an interest in the inventory as subrogee of Purchasers Parsons Odebrecht Joint Venture and Polk County, Iowa, for whom St. Paul bonded projects with the Debtor. Essentially, the controversy involved three separate priority contests between Commerce on one side and each of the Purchasers on the other. Shortly before the trial, though, the parties announced that all of the Purchasers except Austin had settled with Commerce. This left Austin and Commerce to duke it out in a greatly shortened trial.

Commerce and Austin stipulated to all of the facts necessary for our resolution of this matter,[2] so the dispute boils down to a legal issue which, although simply stated, is surprisingly complicated to resolve: When does a lender's security interest in a seller's inventory terminate?

Commerce, the secured lender, contends that a security interest in inventory terminates when title to the inventory is transferred to a buyer, and, in a construction contract (such as the one between Austin and the Debtor), that transfer occurs when the inventory (steel, in this case) is actually incorporated into the final project. Because none of the steel at issue had been incorporated into the final project, but rather was in the Debtor's possession or delivered to Austin's Project site, Commerce claims a superior security interest in all of the steel.

Austin, on the other hand, maintains that title is irrelevant to determining when a lender's security interest in inventory terminates; instead, Austin argues, a lender's security interest in inventory terminates when the seller "identifies" the goods for sale to the purchaser. Since all of the steel at issue had been identified for use on Austin's project (a fact to which the parties stipulated), Austin claims a superior interest in all of the steel. Austin's argument is based on the application of Uniform Commercial Code ("UCC") Revised Article 9-320,[3] which provides that a "buyer in the ordinary course" ("BIOC") takes

---

[2] On October 7, 2004, the parties filed a list of stipulated facts with the court, and unless noted otherwise, all facts in the Background section have been taken from that source.

[3] Federal courts use the choice of law rules of the state in which the court sits. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 490-98, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); *Jump v. Goldenhersh*, 619 F.2d 11, 13 (8th Cir. 1980). Missouri Revised Statute § 400.9-301 provides that the law of the state where the collateral is located governs the priority of security interests in that collateral. In this case, some of the inventory at issue was located at the Debtor's Ottawa, Kansas facility ("Ottawa Plant") and some at the Project site in Missouri. Accordingly, the UCC as

goods free and clear of any security interest in those goods created by the seller, and Austin claims that it was, indeed, a BIOC.

Alternatively, Austin argues that if title is relevant to the termination of a lender's security interest, under the Subcontract between Austin and the Debtor, title to the inventory (goods) passed to Austin no later than upon Austin's payment for those goods, and as of the petition date, Austin had paid for approximately 70% of the inventory at issue.

At trial, the parties offered evidence and lengthy argument in support of their positions. Upon consideration of the evidence and arguments, and review of the relevant law, the Court is now prepared to rule.

## I. BACKGROUND

The Debtor is a fully integrated steel construction company providing "design-build" services to contractors and subcontractors. These services include the procurement of raw materials, design, fabrication, and erection of steel structures. On or about March 31, 2003, Defendant Commerce Bank loaned the Debtor $15 million to fund the operation of its business. As of the petition date, March 18, 2004, the Debtor owed Commerce $11,344,579.70 plus interest and fees. This indebtedness was secured by, among other things, the Debtor's inventory, accounts receivable, and all proceeds thereof. The parties have stipulated to the validity of Commerce's security interest.

On February 5, 2003, the Debtor entered into a contract ("Subcontract") with The Austin Company, Cypress Media LLC d/b/a the Kansas City Star, and Oak Street Redevelopment Corp., (collectively "Austin") to furnish, fabricate, and erect steel for the construction of the Kansas City Star newspaper's new printing facility (the "Project"). More specifically, under the Subcontract the Debtor was required to: (1) prepare shop drawings and erection drawings for each piece of steel that would be used on the Project; (2) purchase finished components and the structural steel shapes identified in the shop

---

adopted in those states would govern respectively. However, because the provisions of the UCC implicated here do not differ in any material way from the versions adopted in Kansas and Missouri, the Court will cite only to the UCC. Additionally, there is no controlling case law in either state that would affect the Court's interpretation of the UCC provisions at issue.

drawings; (3) transform the structural steel shapes into usable steel for the Project; and (4) erect the finished steel. The parties agree that the services portion of the Subcontract predominates over the goods portion.

As of the petition date, the Project was not finished and a large amount of steel was in various stages of the design-build process: 85,611 pounds of steel, with a value of $20,889.72, was in the Debtor's possession and in the process of being fabricated; 376,424 pounds of fabricated steel, with a value of $556,908.72, was located at the Ottawa Plant; and 402,305 pounds of fabricated steel, with a value of $154,485.12, was being stored at the Project site. In total, $732,283.56 worth of steel had been identified for the Project but not erected.

The Debtor agreed to complete the work under the Subcontract for a total price of $7,518,390, but because it would be very difficult, if not impossible, for the Debtor to wait until the Project was completed to receive full payment, the Subcontract provided for a procedure according to which the Debtor could apply for partial "progress" payments before completion of the Project. The basic steps of that procedure were as follows:

1. The Subcontract defined the "Work" to be performed by the Debtor as "the construction and services required by the Subcontract Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided or to be provided by the Subcontractor (the Debtor) to fulfill the Subcontractor's obligations." (Subcontract para. 1.1.6).

2. The Debtor supplied Austin with a "Schedule of Values" which allocated the cost of the Work by sequence to each and every activity included in the Debtor's scope of work. (Subcontract para. 8.1.2)

3. The Debtor submitted an "Application for Payment" based on the Schedule of Values on the first of each month for the "Work" performed in the prior month. (Subcontract para. 8.1.2)

4. Austin paid Applications for Payment approximately 20 days later. (Subcontract para. 8.3.2)

Pursuant to this process, as of the petition date Austin had paid for $447,260.08 of the steel located at the Plant and for $107,813.18 of fabricated steel delivered to the Project site but not erected.

In the course of the hearing, the parties argued that two other provisions of the Subcontract are germane to the Court's inquiry. Austin contends that paragraph 8.2.2, which provides that "the

-4-

Subcontractor (the Debtor) warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment," controls the transfer of title for the inventory paid for by Austin. In response, Commerce argues that because Subcontract paragraph 8.2.1.3 provides that "[s]uch [payment] applications shall not include request for payments of amounts on account of materials and equipment not yet incorporated into the Work," Austin wasn't entitled to apply for payment on account of steel not yet incorporated into the project, *i.e.*, erected, and, therefore, title did not pass to Austin for any steel not yet erected.

## II. DISCUSSION

The starting point for our answer to the question posed above – When does a lender's security interest in a seller's inventory terminate? – is UCC Revised Article 9, and more particularly, UCC §§ 9-201 and 9-315.[4] Section 9-201 provides that a security agreement is effective against purchasers of collateral and § 9-315 provides that "a security interest ... continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest...." The Official Comments to both §§ 9-201 and 9-315 (also the same in Missouri and Kansas) explain that these code sections contain the general rule that a secured party's interest in collateral continues upon the sale of the collateral unless the secured party consents to the release of its security interest or one of the provisions in Article 9 under which a party takes free and clear of the security interest applies. Both comments list § 9-320, the "buyer in ordinary course" – the code section relied upon by Austin – as an example of such an exception.

However, before moving on to our discussion of whether Commerce consented to the sale of its collateral free of its security interest or whether § 9-320 applies to any of the steel at issue here, it is important to note the effect §§ 9-201 and 9-315 have on Commerce's primary argument that the transfer of title determines when a buyer takes collateral free of a lender's security interest, without regard to the

---

[4] Commerce's suggestion that UCC Article 9 does not apply to this transaction is wholly without merit. Section 9-109 provides that Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." UCC § 9-109. This transaction undeniably fits that description. Moreover, because Article 9 governs the transaction, the termination of the security interest created under Article 9 is also governed by Article 9.

buyer's BIOC status under § 9-320. Under § 9-201 and § 9-315 a buyer (other than a buyer in ordinary course) of goods subject to a security interest takes title to the goods purchased, but that title is subject to the lender's security interest. It seems that Commerce may have lost sight of this fundamental rule of secured transactions in its zeal to fix the point in time when its security interest finally ceded priority to Austin at the last possible moment, *i.e.*, upon the steel's incorporation into the project. It is hard to imagine, though, that Commerce, a major lending institution, does not routinely take the position that a buyer who purchases Commerce's collateral, sold without contractual or statutory authorization, takes title to the collateral <u>subject to Commerce's continuing security interest</u>. However, Commerce's argument on this point is directly contrary to that position and the law and, will therefore, be disregarded.

The proper inquiry is whether Commerce consented to the sale of its collateral free of its security interest or whether Austin qualified as a buyer in ordinary course.

### A.    Commerce's Consent

The parties did not offer any evidence of Commerce's contemporaneous consent (or lack thereof) to the Debtor's sale of Commerce's collateral, but the security agreement between the Debtor and Commerce submitted as a joint exhibit sets forth the conditions upon which the Debtor has authority to sell Commerce's collateral free and clear of Commerce's security interest. Specifically, it provides that, "while Grantor (the Debtor) is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to *buyers in the ordinary course of business*." (Joint Exh. 13 at p. 2; emphasis added) Thus, under this provision Austin would have to show that the Debtor was not in default on the date the Debtor "sold" the inventory to Austin and that Austin qualifies as a buyer in the ordinary course of business. In light of our ruling below regarding Austin's status as a buyer in the ordinary course of business, we do not need to address how the term "sell" applies here, whether the Debtor was in default on the date of the sale, and ultimately, whether Commerce consented to the sale of its collateral; however, we do note that the security agreement, presumably a Commerce form document, belies Commerce's position at trial that § 9-320 does not apply to the Subcontract.

**B.      Buyer in Ordinary Course of Business**

Section 9-320 provides that "a buyer in ordinary course of business takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." UCC § 9-320. Official Comment 3 to § 9-320 references § 1-201[5] for the definition of buyer in ordinary course of business, which, in turn, provides in pertinent part:

> "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person...in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices....Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Article 2 may be a buyer in ordinary course of business.

UCC § 1-201. Under this definition, we find that Austin qualifies as a BIOC of all of the steel in its possession, and with regard to the steel located at the Ottawa Plant, Austin is a BIOC of the steel for which it had paid.

      **1.      Conduct, Knowledge, and Ordinary Course**

Section 1-201's requirement that Austin buys goods "in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person...in the business of selling goods of that kind," is easily dispatched. Good faith in this context means "honesty in fact in the conduct or transaction concerned," UCC § 1-201, and there has been no allegation or evidence introduced that Austin was dishonest in its conduct in the transactions with the Debtor.[6] The parties stipulated to the existence of the rest of these elements.

---

[5] Section 1-201 was revised when UCC Article 9 was revised, and both became effective in Missouri and Kansas on July 1, 2001.

[6] Although Austin bears the burden of proof to establish that it is entitled to protection as a BIOC under § 9-320, including the element of good faith, good faith is difficult to prove in the affirmative. It is similar to proving the negative - we were not dishonest. Accordingly, in the absence of allegations or evidence to the contrary, the Court will infer Austin's good faith in its conduct with the Debtor.

### 2.     When Does BIOC Status Attach?

In contrast, because the UCC does not identify the point in a transaction when a buyer attains BIOC status, this element requires considerably more analysis, especially since the Court has not found any dispositive cases from Missouri or Kansas on this issue.

There are at least five potential points at which the ascendency to the honored role of BIOC can be fixed – upon contracting, upon identification of the goods, upon transfer of title, upon delivery, or upon acceptance of the goods[7] – but only transfer of title and identification have received serious consideration. And, not surprisingly, the parties do not agree on which event controls.  To the extent that Commerce recognizes that BIOC status is an issue here, it advocates using title as the watershed, and as mentioned above, Commerce contends that title did not pass until the steel was incorporated into the project. (Austin maintains that it took title to the steel when it paid for the steel.)  Austin, on the other hand, argues that a buyer attains BIOC status when goods are identified to a contract, and the parties have stipulated that all of the steel at issue had been identified.

Commerce's position – as well as the position of the cases favoring title as the determining factor – is that a sale must have taken place in order for a purchaser to be a BIOC, and "sale" is defined in UCC Article 2 (§ 2-106) as the passing of title from the seller to the buyer for a price.[8]  Therefore, Commerce reasons, a purchaser cannot be a BIOC until it obtains title to goods.  The Court declines to adopt this position for four reasons.

First, the Court believes that it misconstrues the statute.  The statute does not specifically require that a sale has taken place (interposing "contract for sale" would be equally sensible), and to the extent that § 1-201 implicitly requires a sale, the reference to Article 2's definition of sale is unwarranted in light of

---

[7] *See Daniel v. Bank of Hayward*, 425 N.W.2d 416, 939-40 (Wis. 1988) ("*Daniel*"). *See also*, Lori S. Segal, *The Buyer-Secured Party Conflict and Section 9-307(1) of the UCC: Identifying When a Buyer Qualifies for Protection as a Buyer in Ordinary Course*, 50 Fordham L. Rev. 657 (1982).

[8] *See, e.g., Chrysler Corp., v. Adamatic, Inc.*, 520 N.W.2d 97 (Wis. 1973) ("*Chrysler*") *overruled by Daniel v. Bank of Hayward*, 425 N.W.2d 416, 939-40 (Wis. 1988); *International Harvester Credit Corp. v. Associates Fin. Servs. Co.*, 211 S.E.2d 430, 433-34 (Ga. 1974).

Article 2's express de-emphasis of the importance of title,[9] and perhaps more importantly, the existence of a specific cross-reference to Article 2 in *another part of the statute*. Rules of statutory construction[10] dictate that the cross-reference to Article 2 in one section militates against a reference to Article 2 where it is not mentioned.

Second, identification makes more sense in the context of the statute. One of the requirements of § 1-201 (discussed in greater detail below) is that a BIOC either has possession of the goods or has "the right to recover the goods from the seller under Article 2." The quoted section of the statute is understood to refer to a buyer's remedy to recover goods from an insolvent seller under § 2-502 or a buyer's right to replevin or specific performance under § 2-716. A review of these provisions reveals that identification, rather than title, is key to the buyer's right to recover goods. *See* UCC §§ 2-502, 2-716.

Third, there is an apparent trend in the case law away from transfer of title as the point at which BIOC status is attained. After *Daniel*, the case that overruled *Chrysler* (the seminal case advocating the use of title), there are apparently no cases holding that BIOC status is attained upon the transfer of title.

Finally, from a policy standpoint we note that using identification rather than passage of title advances Article 9's policy of protecting innocent buyers[11] and places the risk of loss on the secured party who has the ability to protect itself by requiring various inventory controls and reports[12] and who may be in a better position to absorb the loss.[13]

Therefore, the Court concludes that a buyer attains BIOC status at the time goods are identified to a contract, and in this case, the parties stipulated that all of the steel had been identified to the Subcontract.

---

[9] *See* UCC § 2-401.

[10] *Expressio unius est exlusio alterius.*

[11] *See, e.g, Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc.*, 487 A.2d 953, 957 (Pa. 1985).

[12] *General Electric Credit Corp. v. Gayl* (*In re Darling's Homes, Inc.*), 46 B.R. 370, 378 (Bankr. D. Del. 1985).

[13] *Big Knob Volunteer Fire Co.*, 487 A.2d at 958.

### 3.     Possession of, or Right to Recover, the Steel

Having determined that Austin had reached the point in the transaction when it could qualify for BIOC status, whether Austin actually attained BIOC status with regard to particular steel turns on the final test set forth in § 1-201, which limits BIOC status to buyers who "take possession of the goods or [have] a right to recover the goods from the seller under Article 2." Because Austin had physical possession of the 402,305 pounds of steel (worth $154,485.12) located at the Project site, no further discussion is necessary; Austin was a BIOC with regard to that steel. Austin was also a BIOC of most of the steel at the Ottawa Plant as of the petition date, but the application of the statute with regard to that steel is not as straightforward.

At first blush, the statute appears to preclude Austin from being a BIOC of the steel in the Debtor's possession on the petition date because Austin did not have physical possession of that steel and Austin did not have the right to recover it *under Article 2*, inasmuch as the Subcontract was not covered by Article 2.[14] However, upon comparison of the revised § 1-201 to its predecessor statute and a consideration of cases applying the predecessor statute and of the official comment to revised § 1-201, we find that a party that can establish a common law (versus an Article 2-based) "right to recover" may qualify as a BIOC, assuming the other requirements of the statute are met.

The former UCC § 1-201 did not contain the requirement that a BIOC have possession of or the right to recover the good from the seller under Article 2.[15] Nor did the cases applying former

---

[14] As mentioned above, the parties stipulated that the services portion of the Subcontract predominated, so the Subcontract would not be governed by Article 2. *See Bonebrook v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974) (explicating the "predominate purpose test" for determining whether Article 2 applies to a particular transaction).

[15] Former § 1-201 provided:
Buyer in ordinary course of business" means a person who in good faith, and without knowledge that the sale to him is in violation of the rights or security interest of a third party in the goods, buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind. "Buying" may be for cash, by exchange of other property, or on secured or unsecured credit, and includes receiving goods or documents of title under a

-11-

§ 1-201.  Based on a review of the cases applying former § 1-201, the incorporation of the "right to recover" requirement into revised § 1-201 is most likely a function of the fact that BIOC litigation most often arises in the context of a replevin action brought by or against the buyer of goods in which the seller's lender has a security interest, and establishing a right to possession is a fundamental element of a replevin action.  *See First Nat. Bank of Steeleville v. ERB Equipment Co., Inc.*, 972 S.W.2d 298, 300 (Mo. Ct. App. 1998).  In light of the origins of the "right to recover" requirement, the Court does not believe that the embodiment of that requirement into § 1-201 was intended to limit recourse under the statute to only Article 2 buyers.  Official Comment 9 to Revised § 1-201 further supports this interpretation, stating:

> The penultimate sentence [of § 1-201(9)] prevents a buyer that does not have the right to possession as against the seller from being a buyer in ordinary course of business.  Concerning when a buyer obtains possessory rights, see Sections 2-502 and 2-716.  However, the penultimate sentence is not intended to affect a buyer's status as a buyer in ordinary course of business in cases (such as a "drop shipment") involving delivery by the seller to a person buying from the buyer or a donee from the buyer.  The requirement relates to whether *as against the seller* the buyer or one taking through the buyer has possessory rights.

Official Comment 9, Revised § 1-201 (emphasis in original).

This Comment suggests that the inclusion of the Article 2 "requirement" was for referential value rather than for purposes of restricting the statute to Article 2 contracts.  Therefore, the Court believes that a party that establishes its possessory rights over goods *as against the seller,* without reference to Article 2, also qualifies as a BIOC under this portion of the statute.  The Court finds that Austin had such a right with respect to the steel located at the Ottawa Plant and which had been identified for the Project.

There are at least two common law causes of action which would give rise to Austin's right to recover.  And it is no surprise that these parallel similar rights were granted by Article 2 to purchasers of goods.  Under a replevin theory (UCC § 2-716(3)), Austin had a right to recover the goods for which it had paid, and Austin had an equitable right to specific performance (UCC § 2-716(1) and (2)) for delivery

---

pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.  *See* Thomas M. Quinn, *Quinn's Uniform Commercial Code Commentary and Law Digest*, 1-28 (1991).

of all of the steel in the Debtor's possession, although Austin would have to pay for any steel for which payment was owing.

### a. Austin's Right to Recover Under Replevin Theory

To prevail on a replevin claim under Missouri common law, a party must establish that it is entitled to possession of the property, that the defendant has exercised unauthorized control over the property, and that the defendant deprived plaintiff of its right to possession. *First Nat. Bank of Steeleville*, 972 S.W.2d at 300. In the context of the hypothetical posed by § 1-201, and the artificial circumstances in which this issue has arisen, the second two requirements are inapplicable. For in the absence of the Debtor's bankruptcy filing and the Court's order creating the segregated account, Commerce likely would have exercised its right as a secured creditor and taken possession or control of the inventory. The effect of that conduct, which must be implied here, would be that Commerce would have been in possession or control of the steel to the exclusion of Austin. Therefore, all that is required here to establish a right to replevin is Austin's superior possessory right to the steel, *id.*, and the Court finds that Austin has that right because it paid for the steel and, therefore (as discussed below), held title to the steel. *See, e.g., Strothkamp v. St. John's Community Bank, Inc.*, 329 S.W.2d 718, 720 (Mo. 1959) (title may establish right to possession, although it is not crucial to a replevin action); *Fawley v. Bailey*, 512 S.W.2d 477, 480 (Mo. Ct. App. 1973) (same).

Based on the Stipulation and the evidence submitted by Austin, the Court found (above) that Austin paid for $447,260.08 of the steel located at the Ottawa Plant. The parties did not agree, however, as to the effect of Austin's payment for that steel. As detailed earlier, Austin contends that under the Subcontract title to the steel passed "no later than payment," whereas Commerce argues that title did not pass upon payment, but, rather, title to the steel passed upon incorporation of the steel into the final project. Although the parties spent considerable time debating this point, the Court dispatches it easily.

Under a non-Article 2 contract, title passes at the time agreed upon by the parties,[16] and a contract is the best evidence of the parties' intent. *Miller v. Municipal Electric Lighting & Power Co.*, 34 S.W. 585 (Mo. 1896). In this case, the Subcontract provides a clear indication of the parties' intent regarding

---

[16] *See Calcara v. U.S.,* 53 F.2d 767, 768 (8th Cir. 1931).

the passage of title. Paragraph 8.2.1 states: "the Subcontractor (the Debtor) warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment."[17] Commerce attempts to muddy the clarity of this provision by pointing to another provision in the Subcontract (paragraph 8.2.1.3) which states that "[payment] applications shall not include request for payments of amounts on account of materials and equipment not yet incorporated into the Work," and then arguing that title did not pass to Austin upon payment because it applied for payment on account of steel not yet "incorporated" into the project, *i.e.*, erected. Aside from questioning Commerce's standing to interpret a contract to which it was not a party, the Court finds Commerce's interpretation strained and illogical.

First, as Austin pointed out in its response to Commerce's pre-trial brief, Commerce misconstrues the Subcontract's use of the word "incorporate" in paragraph 8.2.1.3 and completely ignores the effect of the defined term "Work" as it relates to "incorporate." Commerce argues that "incorporate" must be given its plain, ordinary meaning, and that doing so in the context of paragraph 8.2.1 means that Austin cannot apply for payment for work not physically *incorporated* into the Project. The Court agrees that "incorporate" should be given its plain, ordinary meaning, *i.e.*, to unite or work into something already existent so as to form an indistinguishable whole.[18] But "incorporate" is not modified by "Project", "building", or "structure" as Commerce's interpretation suggests; rather, "incorporate" is linked to and modified by a defined term, "Work", which means "the construction and services required by the Subcontract Documents, *whether completed or partially completed*, and includes all labor, materials, equipment and services provided *or to be provided* by the Subcontractor (the Debtor) to fulfill the Subcontractor's obligations." (Subcontract paragraph 1.1.6; emphasis added) Thus, paragraph 8.2.1 provides unambiguously that Austin can apply for payment for goods or services performed before that

---

[17] The only possible ambiguity in this provision is the wording that suggests that title may have passed before payment, and no evidence has been introduced to clarify that statement. But that ambiguity does not detract from Austin's argument here, inasmuch as Austin has not argued that title passed earlier.

[18] Merriam-Webster's online dictionary, www.m-w.com.

"work" is actually incorporated into the Project; in fact, the definition of "Work" specifically contemplates such an application.

Second, the result suggested by Commerce does not flow even if we adopt Commerce's interpretation of the Subcontract. Title would still pass to Austin no later than payment, even if the payment was for goods for which Austin was not yet entitled to apply for payment. In other words, the Debtor's (hypothetical) breach of the contract by prematurely applying for the payment of goods not yet incorporated into the Project does not prevent paragraph 8.2.2 from transferring title of the goods for which payment (rightly or wrongly) was made. Therefore, the Court finds that under the Subcontract between the Debtor and Austin, Austin held title to all of the steel for which payment was made as of the petition date, and thereby had the right to replevin that steel.

### b.    Austin's Right to Recover Under Specific Performance Theory

Under Missouri law, a plaintiff is entitled to specific performance as a matter of right if there is no adequate remedy at law and the contract is fair and plain. *In re Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 38 (8th Cir. 1975) (citing *Miller v. Coffeen*, 280 S.W.2d 100, 102 (Mo. 1955)). Although specific performance relating to the sale of personal property is less common than for real estate, specific performance is appropriate when the goods are unique or difficult to obtain elsewhere. *Id*. at 39-40; *Boeving v. Vandover*, 218 S.W.2d 175, 178 (1949) (ordering an auto dealer to specifically perform on a contract for the sale of a car at a time when new cars were extremely difficult to obtain).

In this case, specific performance is warranted because there is no adequate remedy at law, inasmuch as the steel at issue had either been custom-ordered or fabricated to Austin's specifications, and the Court finds that the contract was fair and plain, as evidenced by the parties' stipulation to the values of the steel at issue. That some of the steel at the Ottawa Plant may not have been ready for delivery as of the petition date is not a barrier to Austin's recovery here because the values to which the parties stipulated account for the lesser value of the undelivered, partially fabricated, and fabricated steel.

In short, the Court reiterates its findings in this section that § 1-201's requirement that a BIOC have a right to recover the goods under UCC Article 2 encompasses the right to recover goods under non-

Article 2 law, and Austin had a right to recover the undelivered steel for which Austin paid under either a common law replevin or specific performance theory.

### c.    **Constructive Possession**

Austin also fulfills § 1-201's requirement that Austin "take possession of the goods or [have] a right to recover the goods from the seller under Article 2," because Austin had "constructive possession" of the paid-for, undelivered steel, and the Court interprets "possession" as used in the statute to include "constructive possession."

Constructive possession is a concept, used in a variety of contexts, which recognizes that there are circumstances under which the right or ability to possess an object is strong enough to give rise to the legal effect of "possession" in the absence of actual physical possession. *See, e.g, Vogelsang's Adm'r v. Fisher*, 31 S.W. 13, 17 (Mo. 1895) (discussing constructive possession conferred upon delivery of a warehouse receipt); *Emory v. Arnold*, 168 S.W. 320, 321 (Mo. Ct. App. 1914) (acknowledging that action in replevin will lie against defendant in constructive possession of plaintiff's goods if defendant has control over and ability to deliver those goods). *See also*, *State v. Chavez*, 128 S.W.3d 569, 574 (Mo. Ct. App. 2004) (drawing distinction between "actual possession" of an illegal substance, where the person has the substance on his person or within his easy reach and convenient control, and "constructive possession," where a person has the power and intention at a given time to exercise dominion or control over the substance either directly or through another person or persons) (citations omitted). Accordingly, the Court finds that Austin's possessory rights, arising from Austin's payment for and title to the steel, were sufficiently strong to imbue Austin with constructive possession of the steel, in the context of § 1-201.

The Court interpretation of "possession," as used in § 1-201, to encompass constructive possession is supported by the fact that the UCC does not define possession and the suggestion in the Official Comment to § 9-313 that "possession" in the code does not require actual possession. Official Comment 3 states that agency principles should be applied to determine whether a party not in actual possession of collateral should be considered to have constructive possession of it, although the comment does not use that specific term. So, for example, a secured creditor may have a perfected security interest in certain collateral, *e.g.*, a certificated security, for which possession is necessary to perfect, if the secured

creditor's agent is in possession of the collateral. The Comment goes on to say that a court could find that the debtor may have possession of the collateral (thereby defeating perfection), if the collateral is possessed by a person in control of the debtor, even if that person holds the collateral for the ostensible benefit of the secured creditor. *See also*, J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code s* 23-10 at 935-936 (2d ed. 1980) (discussing perfection by possession under Article 9). Thus, in light of the flexible definition of possession contemplated by the Official Comment, the Court finds it appropriate to apply that term, as it is used in § 102-1, to the situation where a seller of goods retains the goods after full payment for those goods and the transfer of title to the buyer.

Further, the decision to apply constructive possession principles here also advances the apparent goal of § 1-201 (and § 9-320), which is to provide BIOC protection to innocent buyers. *See Chrysler Corp. v. Adamatic*, 208 N.W.2d 97, 107 (Wis. 1973) ("It seems clear that, if there is a sale and the buyer has obtained title to the goods, his status as a buyer in ordinary course will not be defeated merely because he has not taken possession.") *overruled on different grounds by Daniel v. Hayward*, 425 N.W.2d 416 (Wis. 1988).

Thus, the Court finds that with regard to the steel located at the Debtor's Ottawa Plant and for which Austin had paid, Austin had constructive possession of that steel and such possession satisfies § 1-201's requirement that a BIOC have possession of the goods.

## CONCLUSION

In sum, for the reasons stated above, the Court finds that Commerce's security interest in the steel identified to the Austin project as of the petition date terminated to the extent Austin qualifies as a buyer in ordinary course of business under UCC § 9-320. The Court further finds that Austin qualifies as a buyer in ordinary course of business with regard to the $154,485.12 worth of steel in Austin's possession and the $384,017.08 worth of steel for which Austin had paid, and which was located at the Debtor's Ottawa Plant. Thus, in total, Austin has an interest superior to Commerce in $538,502.20 of the $732,283.56 of steel at issue. In light of the Court's March 25, 2004, ruling, as incorporated in the May 10, 2004 Final Order, this finding translates to a requirement that Commerce turn over to Austin $538,502.20 of the money Commerce now holds in the segregated account.

This opinion constitutes the Court's findings of fact and conclusions of law and is a final judgment.

A separate order will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED** this 17th day of November, 2004.

                                                   /s/ Jerry W. Venters
                                                 HONORABLE JERRY W. VENTERS
                                                 UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was sent
electronically or conventionally to:
Kathryn B. Bussing
John Joseph Cruciani
Lisa A. Epps
Michael D. Fielding
Scott J. Goldstein
Benjamin F. Mann
Jonathan A. Margolies
Mark Moedritzer
Donald G. Scott
Bruce E. Strauss
Ronald S. Weiss
Frank Wendt
Julia Frost-Davies
Andrew J Gallo
Eleanot Heard Gilbane
Anita L. Shodeen